UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
Richard Moreno, *pro se*,                    **NOT FOR PRINT OR**
                                             **ELECTRONIC PUBLICATION**
                 Petitioner,

                                             **MEMORANDUM & ORDER**
        -against-                            06-CV-4602 (KAM)

J.T. Smith, Superintendent,

                 Respondent.
----------------------------------X
**KIYO A. MATSUMOTO, UNITED STATES DISTRICT JUDGE:**

         *Pro se*[1] petitioner Richard Moreno ("petitioner") seeks

a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, from his

March 13, 2000 conviction in Supreme Court, Kings County, for

three counts of Robbery in the First Degree (N.Y. Penal Law §

160.15(4)).  Petitioner's conviction arises out of armed

robberies of three individuals that occurred on November 20,

1998.  Petitioner was sentenced to three twenty-five year terms

of imprisonment to run consecutively.  Petitioner is

incarcerated pursuant to this sentence.  For the reasons set

forth more fully below, the petition is denied in its entirety.

                            **BACKGROUND**


**I.   The Trial**

---

[1]      Petitioner initially moved *pro se* for a writ of habeas corpus.
However, in anticipation of the evidentiary hearing scheduled in this matter,
the court appointed counsel for petitioner on September 22, 2009, pursuant to
18 U.S.C. § 3006A(a)(1)(I).  (See Doc. No. 14, Order dated 9/22/2009.)

The following facts are derived from the evidence introduced at petitioner's state court trial.

On November 20, 1998, petitioner and his accomplice, Leslie Prosper ("Prosper"), entered the Showtime Barber Shop located at 327 Irving Avenue in Brooklyn, New York. (Tr. 3, 13, 71.)[2] Petitioner pointed a gun at Bobby Stan ("Stan"), a customer, ordered Stan to move to a room in the back of the barbershop, and forced him to lie face down on the floor. (Tr. 14-16.) Petitioner then removed Stan's wallet. (Tr. 16.)

Shortly thereafter, William Bonilla ("Bonilla") entered the barbershop. (Tr. 125.) Petitioner pointed his gun at Bonilla and ordered him, too, to move to the back room and to lie face down on the floor. (Tr. 127, 129-33, 164-70.) Once Bonilla was on the floor, he was struck several times on the head with a metal object. (Tr. 22, 135-36.) On petitioner's orders, Prosper removed Bonilla's wallet, jewelry and money. (Tr. 134-36.)

A third individual, "George,"[3] entered the store and was ordered to the back room. (Tr. 137.) He, too, was beaten and his valuables were taken. (Tr. 138-39.)

---

[2]     "Tr." refers to the State Court Record, Trial Transcript of petitioner's trial. (*See* Doc. No. 9, Resp. Exs. C, D; Resp. Supp. Ex., State Court Record, Trial Transcript.)

[3]     This victim did not testify at trial and his full name is unknown.

Finally, a fourth individual, Angelo Discala ("Discala"), entered the barbershop. (Tr. 47-48, 139.) Like the victims who preceded him, Discala was ordered to move to the back room, where he was beaten and his jewelry, wallet, identification and credit cards were taken. (Tr. 50-56, 139-40.)

Petitioner then ordered the victims to move into the bathroom and shut the door on them. Shortly thereafter, he and Prosper fled from the barber shop. The victims slowly exited the bathroom and then decided to go to their homes.

Out of fear of retaliation, the victims refrained from immediately calling the police. (Tr. 30, 62, 175.) The following night, Discala and Bonilla reported the crime to the police. (Tr. 62, 94, 152, 173.) Roughly one week after the incident, Stan spoke to the police. (Tr. 30, 36.) These three victims met with Detective Antony Pasquin ("Detective Pasquin"), who initiated an investigation into the incident.[4] (Tr. 29-30, 62-63, 153-55.)

Detective Pasquin interviewed the barber, Sammy Torres, in connection with his investigation. (Tr. 76.) He

---

[4]     The fourth victim, George, did not report the incident to the police and avoided involvement with the investigation purportedly out of fear of retaliation. (Tr. 67, 72.) Additionally, he did not testify at trial. Shortly after the incident, his whereabouts became unknown as he ceased all contact with the other victims. (Tr. 67-68.)

also interviewed Prosper, who, among other things, admitted his involvement in the robbery. (*Id.*) At trial, the state sought to question Detective Pasquin about his interview of Prosper. Defense counsel objected to Detective Pasquin's testimony about his interview with Prosper on the grounds that it constituted hearsay and that its admission unfairly prejudiced petitioner in violation of the Due Process Clause as the jury would assume that Prosper implicated petitioner as the other perpetrator. (Tr. 73-75.) After a brief sidebar, the court ruled that Detective Pasquin could testify to the following: (i) Prosper admitted to participating in the robbery, (ii) Prosper provided information to the police regarding the robbery, and (iii) the police arrested Prosper for his involvement in the robbery on February 28, 1999. (Tr. 76-78.) The prosecutor questioned Detective Pasquin as follows:

> Q:  Did anybody else become an object of your investigation?
>
> A:  Yes.
>
> Q:  And who was that person?
>
> A:  Leslie Prosper.
>
> * * *
>
> Q:  How was it that Leslie Prosper became a subject of your investigation?
>
> A:  I was informed by detectives – police officers in the Bronx Street Crime Unit that he was giving

information in reference to this robbery that had taken place.

MR. MILLET:    Objection

THE COURT:    Overruled.  I'll allow it not for the truth of the matter asserted, jurors, but just to show you how this investigation evolved.

Q:  Did there come a time that you spoke to Leslie Prosper?

A:   Yes.

Q:  When you spoke to Leslie Prosper, did Leslie Prosper tell you whether or not he was a participant in the robbery that occurred on November 20th at Showtime Barber Shop?

A:  Yes, he did.

Q:  Did he indicate that he was involved?

A:  Yeah, he did.

Q:  Did there come a time that Leslie Prosper was arrested with regard to the robbery investigation at the Showtime Barber Shop?

A:  Yes.

* * *

Q:  After the arrest of Leslie Prosper, did you continue your investigation with regard to this incident?

A:  Yes, I did.

Q:  And did there come a time that you began to investigate anybody else with regard to this incident?

A:  Yes, I did.

Q:    And who else did you begin to investigate?

A:    Richard Moreno.

(Tr. 76-78.)

Petitioner was charged with three counts of Robbery in the First Degree (N.Y. Penal Law § 160.15(4)), three counts of Robbery in the Second Degree (N.Y. Penal Law § 160.10(1)), three counts of Robbery in the Third Degree (N.Y. Penal Law § 160.05), three counts of Grand Larceny in the Fourth Degree (N.Y. Penal Law § 155.30(5)), three counts of Petit Larceny (N.Y. Penal Law § 155.25(4)), two counts of Attempted Assault in the Second Degree (N.Y. Penal Law §§ 110.00/120.05(2)), one count of Attempted Assault in the Third Degree (N.Y. Penal Law §§ 110.00/120.00(1)), three counts of Menacing in the Second Degree (N.Y. Penal Law § 120.14(1)), and one count of Criminal Possession of a Weapon in the Fourth Degree (N.Y. Penal Law § 265.01(2)).  (Resp. at 5-6.)

Petitioner's jury trial was held on March 6, 2000 through March 13, 2000, before Justice Lawrence Knipel in Supreme Court, Kings County.  (*See generally* Tr.)  The jury convicted petitioner of three counts of Robbery in the First Degree (N.Y. Penal Law § 160.15(4)).  (Tr. 440-43.)  Petitioner was sentenced as a persistent violent felony offender to three twenty-five year terms of imprisonment to run consecutively.

(*See* Resp. Ex. E at 9-10.)  Petitioner remains incarcerated

pursuant to that judgment.

## II.  Post-Trial Proceedings in State Court

Petitioner appealed his conviction contending that the

trial court erred in permitting Detective Pasquin to testify

about his conversation with Leslie Prosper.  In particular,

petitioner assailed portions of Detective Pasquin's testimony

indicating that Prosper admitted to participating in the

robbery, that Prosper provided the police with information about

the robbery, and that the police arrested Prosper for his

involvement in the robbery.  (*See* Resp. Ex. F., Def. App. at 23-

26.)  Petitioner contended that the admission of this hearsay

unfairly prejudiced him in violation of the Due Process Clause

of the Fourteenth Amendment as it implied that Prosper had

identified petitioner as his accomplice.  Additionally,

petitioner contended that the admission of this hearsay without

the opportunity to cross-examine Prosper violated his right to

confront witnesses as is required under the Sixth Amendment.

The Appellate Division, Second Department ("Appellate

Division") affirmed the conviction in *People v. Moreno*, 303

A.D.2d 424, 755 N.Y.S.2d 868 (2d Dep't 2003).  The Appellate

Division held that the trial court did not err in admitting the

testimony of Detective Pasquin as it was admitted to

"demonstrate how the police investigation evolved" and not for
the truth of the matter asserted.  *Moreno*, 755 N.Y.S.2d at 869.
Moreover, the Appellate Division held that petitioner's Sixth
Amendment challenge to the admission of this testimony was "not
preserved for appellate review."  (*Id.*)  The New York Court of
Appeals denied leave to appeal.  *See generally People v. Moreno*,
100 N.Y.2d 564, 763 N.Y.S.2d 821 (N.Y. 2003).

### A.   Section 440.20 Motion to Set Aside Sentence

Petitioner filed a *pro se* motion pursuant to New York
Criminal Procedure Law § 440.20(1), seeking an order setting
aside his sentence for various due process violations.
Petitioner contended that the sentencing judge relied on false
information provided by the prosecutor and also asserted that
the sentencing court erred in imposing consecutive rather than
concurrent terms of imprisonment.  (*See* Resp. Ex. H, Def. 440.20
App. at 2, 4-16.)

The trial court denied petitioner's motion to set
aside his sentence.  (*See* Resp. Ex. J, Dec. & Order, Indict. No.
3003/99 (Sup. Ct. Kings County Jul. 23, 2004).)  With respect to
petitioner's claim premised on false information, the trial
court held that the transcript of the sentencing hearing refuted
petitioner's claim as it indicated that the sentencing court did
not rely on the challenged evidence.  Further, the court held

that petitioner's claim was procedurally barred pursuant to New York Criminal Procedural Law §§ 440.30(4)(c) and (d) for failure to submit the appropriate evidentiary support. Finally, the court held that petitioner waived this claim by failing to challenge the evidence at sentencing. (*Id.* at 4-5.) The court denied petitioner's consecutive sentencing claim on its merits noting that the charges and convictions, each for a different victim, supported consecutive sentencing under New York law. (*See id.* at 5-7 (citing N.Y. Penal Law § 70.25).) The Appellate Division denied petitioner's application for leave to appeal. (*See* Resp. Ex. K, *People v. Moreno*, Dec. & Order on Appl., 2004-06323 (2d Dep't Oct. 13, 2004).)

**B.    Section 440.10 Motion to Vacate Conviction**

Petitioner then filed a *pro se* motion pursuant to New York Criminal Procedure Law § 440.10(1)(h), seeking an order vacating his conviction on the ground that his Sixth Amendment right to the effective assistance of counsel was violated. Petitioner asserted that counsel was ineffective for two reasons: (1) counsel failed to advise him of the benefits and consequences of pleading guilty, and (2) counsel committed several errors at trial, including failing to preserve the Confrontation Clause claim, failing to impeach Detective Pasquin

with police reports, and failing to file unspecified pre-trial motions. (*See* Resp. Exs. L1, N, Defendant's 440.10 Appeal.)

The trial court denied petitioner's § 440.10 motion to vacate. (*See* Resp. Ex. O, Dec. & Order, Indict. No. 3003/99 (Sup. Ct. Kings County Mar. 3, 2006).) The court denied petitioner's plea-related claim on the merits. (*Id.* at 8-11.) The court also denied petitioner's preservation-related claim on the merits, holding that trial counsel would not have succeeded in preventing the admission of Detective Pasquin's testimony had he objected and, therefore, trial counsel did not provide ineffective assistance. (*Id.* at 4-8.) Finally, the court noted that all of petitioner's remaining claims were "without legal merit." (*Id.* at 13.) The Appellate Division denied petitioner's application for leave to appeal. (*See* Resp. Ex. P, *People v. Moreno*, Dec. & Order on Appl., 2006-03707 (2d Dep't Jun. 16, 2006).)

## III. Habeas Corpus Proceedings in Federal Court

Upon completion of litigation in state court, petitioner filed the instant application seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (*See* Doc. No. 1, Petition ("Pet.").) Petitioner raises the following claims: (1) admission of Detective Pasquin's testimony regarding Prosper violated the Confrontation Clause; (2) imposition of concurrent

sentences and reliance on false information renders his sentence unconstitutional; and (3) ineffective assistance of counsel. (*See* Pet. at 4-5.) Respondent opposes the Petition in its entirety. (*See* Doc. No. 4, Response to Order to Show Cause ("Response" or "Resp.").)

On November 4 and 5, 2009, this court held an evidentiary hearing ("Hearing")[5] regarding petitioner's ineffective assistance of counsel claims. *See Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998) (district court evaluating claims of constitutional ineffectiveness "should, except in highly unusual circumstances, offer the asserted ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs"). At the hearing, petitioner and his trial counsel, Michael Millet ("Millet"), testified, among others. (*See generally* H.; H2.)

### A.  Petitioner's Hearing Testimony

Petitioner at first retained counsel, Joseph Mure ("Mure"), to represent him in the state criminal proceedings but later requested the Judge to appoint new counsel. (H. 43-44, 59;

---

[5]    References to the 11/4/2009 portion of the Hearing transcript are denoted by "H." References to the 11/5/2009 portion of the Hearing transcript are denoted by "H2."

Respondent's Hearing Exhibit ("RX") B.)  The court appointed a new attorney, Wayne Bodden ("Bodden"), but after petitioner expressed dissatisfaction with Bodden, on January 14, 2000 the court appointed Millet to represent petitioner.  (H. 44, 72.) Millet represented petitioner form that date through sentencing. (*See generally* H.; H2.)

Petitioner testified on direct examination that he recalled Millet conveying a plea offer of $1^1/_2$ to 3 years to him. (H. 16, 75.)  However, petitioner testified that he rejected the $1 \ ^1/_2$ - 3 year offer because he sought and was willing to plead guilty only to a plea offer of one year.  (H. 16, 77.) Petitioner testified that he sought a one-year plea offer based upon a statement made to him by Mure, who had initially told petitioner that Mure believed the case against petitioner was weak and that a one-year offer was possible.  (H. 77, 90; H2. 62.)

Petitioner further testified on direct that he did not recall having any discussions with Millet regarding the risks or benefits of going to trial versus pleading guilty, or the strengths and weaknesses of the case against him.  (H. 14, 16, 17.)  Petitioner also testified that he was never informed by Millet as to the maximum exposure he faced if he were to be convicted after trial (H. 14, 16-17), or specifically that he

could face consecutive sentences on each of the three robbery counts (H. 20). Rather, petitioner claimed that he did not learn of the possibility that he faced a consecutive sentence totaling 75 years until he appeared at sentencing. (H. 24.)

Petitioner testified that had he known he faced a maximum sentence of 75 years after trial, he would have "immediately" accepted the plea offer of $1^1/_2$ to 3 years. (H. 25-26; H2. 62.) Petitioner also stated that "out of fear" he would say "I did do it" under oath if he had known that he was facing a possible sentence of 75 years. (H2. 63.)

On cross-examination, petitioner acknowledged that he did indeed have some discussion with Millet regarding the possible sentence he could face in his case. (H. 36.) Specifically, petitioner testified that he had "limited" discussion with Millet regarding the possible sentence he faced, which he defined as "once, maybe twice." (H. 36.) Respondent's counsel questioned petitioner as follows:

> Q:   Now, sir, is it your testimony that you have had limited discussions with Michael Millet regarding the possible sentence you could face in this case?
>
> A:    Yes.
>
> Q:   None at all?
>
> A:   No, I didn't say none at all.  I said limited, means once, maybe twice.

(H. 36.)  Additionally, petitioner testified that he had

previously been acquitted of an attempted murder charge.  (H.

37.)

On cross-examination, Respondent introduced a letter

dated June 1, 2000, signed by petitioner and addressed to Mure,

his first trial counsel, discussing information petitioner

received from his daughter's mother, Melissa Hernandez

("Hernandez").[6]  (RX A, H. 54-57.)  In the letter, petitioner

stated:

> My wife has informed me that you told her I am facing
> 'LIFE' that strikes me as an odd scenario [sic], as
> I've maintained my innocence & the charges are bogus '
> in & of themselves!!  If it is a matter of money, well
> we both know what I've already given you, is merely
> pennies to both of us, Especially where my life is
> concerned! . . . I have an absolute confidence in my
> innocence & I expect you to defend me in like manner.

(RX A.)  However, petitioner testified that Mure never advised

petitioner that petitioner could be facing life.  (H. 64, 88-

90.)  Moreover, petitioner testified that he did not believe

that he was truly facing life, and instead perceived Mure's

comment to Hernandez as a ploy to get more money from

petitioner.  (H. 80.)

---

[6]     Although the letter shows petitioner referring to Hernandez as his
"wife" and acknowledging her role conveying legal advice from counsel to
petitioner (*See* RX A), prior to the introduction of the letter petitioner
claimed on the stand that he did not discuss any legal issues with Hernandez
(H. 40), that he did not recall Hernandez speaking to any of his attorneys in
his state case (H. 42), and that in the year 2000, although he sometimes
referred to Hernandez as his "girlfriend" or "fiancée," he never referred to
her as his "wife" (H. 40-41).

Petitioner also testified that he had submitted a *pro se* motion to the trial court dated January 6, 2000, prior to the appointment of Millet. (H. 70-71, RX C.) Petitioner testified that the motion correctly reflected his pre-trial statements to the trial court that "[t]he evidence of [petitioner's] participation in the alleged robbery is at least flimsy and most of the said evidence should prove to be inadmissible at trial." (H. 72; RX C.)

## B. Trial Counsel Millet's Hearing Testimony

Millet testified that over the course of his roughly 40-year career as a criminal defense attorney he has worked with thousands of clients and tried approximately one hundred felony jury trials to verdict. (H. 93, 95.) Millet stated that he creates files for the clients he represents in his private practice, and usually on a daily basis creates detailed activity logs reflecting his work. (H. 94 -96, 107, 116; RX G; RX H.)

Millet testified that he did not have any specific recollection of the conversations he had with petitioner prior to petitioner's trial. (H. 113; H2. 45.) In particular, Millet had no specific recollection as to whether he discussed the strengths and weaknesses of the case or petitioner's sentencing exposure with petitioner, and his notes do not specifically reflect such discussion. (H. 114; *see* RX G.) However, Millet

testified that that it is not his routine practice to note the specific content of a conversation with a client such as whether he discussed the merits of a case or sentencing possibilities. (H. 114.) Rather, Millet stated that he would routinely note only "what offer was made, and if a client turned down that offer." (H. 114.)

Millet testified, however, that as a matter of his routine practice he sees it as his duty as a criminal defense lawyer to advise a client whenever a plea offer is made, and that customarily, he also advises clients about their maximum sentencing exposure, chances of success at trial, and his view regarding the quality of the plea offer. (H. 98.) Additionally, in cases where a client faces the potential for consecutive sentences, Millet testified that as a matter of practice, he "generally" discusses the possibility of consecutive sentencing with the client (H. 98), and also discusses a client's total potential sentencing exposure in at least 90% of such cases and provides a recommendation as to whether to accept a plea in roughly 75% of such cases (H2. 4-7). Millet further testified that as a matter of practice, he might not discuss a client's sentencing range when a client has already expressed a strong preference for taking a plea offer.[7]

---

[7]    The court rejects petitioner's assertion that Millet's testimony regarding the 25% of cases in which he does not discuss maximum sentencing

(H2. 37-38.)  However, Millet testified that the decision of
whether to accept a plea offer is ultimately the decision of the
client.  (H. 95.)

In petitioner's case, between the date of Millet's
appointment to represent petitioner on January 14, 2000 and
petitioner's trial, Millet testified that his activity logs
reflected multiple conversations with both petitioner and
Hernandez.  (H. 113, 117-20; H2. 21-23, 40-43; *see also* RX G.)
Specifically, according to Millet's testimony and
contemporaneously recorded notes, he spoke to petitioner on the
telephone on January 26, 2000 for fifteen minutes, on February
2, 2000 for fifteen minutes, on February 5, 2000 for a total of
one hour, and on February 8 and 16, 2000 for another fifteen
minutes each.  (H. 117-20.)  Additionally, Millet testified that
according to his notes, at the courthouse on both February 4,
and March 1, 2000 he spoke to petitioner in person along with
Hernandez.  (H. 118; H2. 21-24.)  Finally, Millet's notes
indicated that he also spoke to Hernandez alone on the telephone
on January 18 and 24, and February 16 for a total of one hour.
(H. 117-20.)

---

exposure was based upon facts not in evidence.  (*See* Doc. No. 32, Pet. Supp.
Mem. at 6, n.2.)  Rather, a careful reading of the transcript reveals that,
contrary to petitioner's assertions, the court's questioning of Millet was
directed at determining with which 25% of clients Millet declines to discuss
maximum sentencing exposure.  (*See* H2. 4-5.)

During the period when these conversations took place, Millet testified that there were plea offers from the prosecution and the court, with the court itself proposing an offer of $1^{1}/_{2}$ to 3 years during court appearances on both February 4, and March 1, 2000. (H. 109, 112; H2. 21-23, 43, 45; RX H.) According to Millet, he viewed the court's $1^{1}/_{2}$ - 3 year plea offer as, "in the immortal words of the Godfather . . . an offer you can't refuse." (H2. 3.) Millet explained:

> I mean one and a half to three. [Petitioner]'s looking at up to 25 years on each of three robbery counts if he loses after trial, with a possibility of consecutive time, and at the time that offer was made he had a good part of the one-and-a-half year minimum [served] in [jail] already.

(H2. 3.) Millet testified that based upon his prior practice and experience, he could not think of "any" reason why he would not have conveyed his view of the plea as a good offer to petitioner, and that he believed based upon his customary practice it would have been "almost impossible" that he did not tell petitioner how he felt about the offer in this case. (H2. 3-4, 7, 36-37.)

However, Millet testified that according to his notes, petitioner rejected the court's $1^{1}/_{2}$ - 3 year offer both on February 5, 2000 during a telephone conversation with Millet (H. 111-12), and again on March 1, 2000 (H2. 21-23). Prior to petitioner's final rejection of the court's plea offer on March

1, 2000, Millet estimated that he spoke to petitioner for a total of two or two and a quarter hours.  (H2. 43.)  The case went to trial on March 6, 2000.  (H2. 23.)

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), established a deferential standard that federal courts must apply in reviewing state court decisions on habeas review. Under AEDPA, a federal court may grant habeas relief with respect to a federal claim adjudicated on the merits in state court only if the adjudication of the claim resulted in a decision that was either: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,"[8] or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  In addition, "a determination of a factual issue made by a State court shall be presumed to be correct,"

---

[8]    Federal courts may also consider the decisions of inferior federal courts as "helpful amplifications of Supreme Court precedent," in "evaluating whether the state court's application of the law was reasonable."  *Matteo v. Superintendent,* 171 F.3d 877, 890 (3d Cir. 1999) (en banc)*; see also O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir. 1998) ("To the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness *vel non* of the state court's treatment of the contested issue.")*; Bohan v. Kuhlmann,* 234 F. Supp. 2d 231, 248 n.10 (S.D.N.Y. 2002) (a district court is not required to disregard a Circuit court's interpretation of "clearly established Federal law, as determined by the Supreme Court")*; Shiwlochan v. Portuondo,* 345 F. Supp. 2d 242, 263 (E.D.N.Y. 2004) (same).

and the habeas petitioner has the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).[9]

A state court's decision is "contrary to" clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law . . . [or] if the state court decides a case differently than [the] Court has on a set of materially indistinguishable [facts]." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision is an "unreasonable application" of federal law "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies [that principle] to the facts of the . . . prisoner's case." *Id.* at 407. The Supreme Court has emphasized that the reasonableness of the application of the law is to be assessed objectively rather than subjectively. *Id.* at 409-10. Therefore, "a federal habeas court may not issue the

---

[9]     There is an open question whether, "in order to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was "unreasonable" [under § 2254(d)(2)], or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence." *Wood v. Taylor*, 130 S.C.t 841, 848-50 (2010) (noting that the Supreme Court has previously "explicitly left open the question of whether § 2254(e)(1) applies in every case presenting a challenge under § 2254(d)(2) and "once more" declining to reach the issue); *see also Green v. Travis*, 414 F.3d 288, 299 n.6 (2d Cir. 2005) ("This court has not yet addressed whether a petitioner seeking habeas relief must prevail under both § 2254(d)(2) and § 2254(e)(1)."). Here, the court need not address this question as petitioner's claims rest and are considered solely on the "unreasonable application" prong of § 2254(d)(1).

writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

Additionally, the Second Circuit has instructed that a federal court's conduct of an evidentiary hearing in the course of federal habeas proceedings does not affect the application of the deferential AEDPA standard. *See Wilson v. Mazzuca*, 570 F.3d 490, 500 (2d Cir. 2009). Thus, where, as here, "the habeas claim is brought under 28 U.S.C. § 2254(d)(1), a habeas court asks whether there was 'an unreasonable application of clearly established Federal law' in light of all the facts and circumstances – including whatever facts are discovered during a post-conviction hearing in federal court subject to the requirements of 28 U.S.C. § 2254(e)(1)" which requires a presumption of correctness for state court factual determinations rebutted only by clear and convincing evidence. *Id.*

## DISCUSSION

I.  Confrontation Clause Claim

Petitioner contends that his Sixth Amendment right to confront witnesses was violated when the court permitted Detective Pasquin to testify about Prosper's statements. (Pet. at 4.) Respondent asserts that the court is procedurally barred from review of this claim as the state court rejected it on an independent and adequate state law ground, namely, New York's preservation rule. (Resp. at 13-15.) Respondent further asserts that the claim lacks merit as the state did not offer the challenged statements for their truth (*i.e.*, as improper hearsay); rather, the state offered them to establish how the robbery investigation evolved. (Resp. at 15.)

"Federal courts generally will not consider a federal issue in a case 'if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *See, e.g.*, *Garvey v. Duncan*, 485 F.3d 709, 713 (2d Cir. 2007) (quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002)). "This rule applies regardless of whether the independent state law ground is substantive or procedural and whether the case is in federal court on direct review or from state court via a habeas corpus petition." *Garvey*, 485 F.3d at 713 (citing *Lee*, 534 U.S. at 375).

A state law ground is "only adequate to support the judgment and foreclose review of a federal claim if it is

'firmly established and regularly followed' in the state."
*Garvey*, 485 F.3d at 713 (quoting *Lee*, 534 U.S. at 376).  The
Supreme Court has noted that although a firmly established and
regularly followed rule will ordinarily preclude review of a
federal claim, "[t]here are . . . exceptional cases in which
exorbitant application of [even] a generally sound rule renders
the state ground inadequate to stop consideration of a federal
question."  *See Lee*, 534 U.S. at 376.  In *Lee*, the Supreme Court
identified three factors (the "*Lee* factors") to guide a federal
court's determination of whether application of a state law
ground is "adequate" to stop consideration of a federal
question:

> (1)  whether the alleged procedural violation was
> actually relied on in the trial court, and whether
> perfect compliance with the state rule would have
> changed the trial court's decision;
>
> (2)  whether state caselaw indicated that compliance
> with the rule was demanded in the specific
> circumstances presented; *and*
>
> (3)  whether petitioner had "substantially complied"
> with the rule given "the realities of trial," and,
> therefore, whether demanding perfect compliance with
> the rule would serve a legitimate government interest.

*Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (citing *Lee*,
534 U.S. at 381-85).  The *Lee* factors "are not a three-prong
test: [rather] they are guideposts to aid inquiry" of adequacy.
*See Clark v. Perez*, 510 F.3d 382, 391 (2d Cir. N.Y. 2008); *see
also Cotto*, 331 F.3d at 240 (the *Lee* factors "were not presented

as a 'test' for determining adequacy . . . [but rather for use]
as guideposts in 'evaluat[ing] the state interest in a
procedural rule against the circumstances of a particular
case'") (*quoting Lee*, 534 U.S. at 381-85).

Alternatively, a federal court may also review a
federal claim that is barred by an independent and adequate
state law ground if "the prisoner can demonstrate cause for the
default and actual prejudice as a result of the alleged
violation of federal law, or demonstrate that failure to
consider the claims will result in a fundamental miscarriage of
justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see
also Cotto*, 331 F.3d at 239 n.10 ("a habeas petitioner may also
bypass the independent and adequate state ground bar by
demonstrating a constitutional violation that resulted in a
fundamental miscarriage of justice . . .").

In the instant action, the state court held that
petitioner failed to preserve his Confrontation Clause claim for
appellate review under the "contemporaneous objection" rule.
*See People v. Moreno*, 755 N.Y.S.2d 868, 869 (2d Dep't 2003)
(noting that defendant's confrontation clause clam "is not
preserved for appellate review"). Under New York law, "an issue
is properly preserved for appeal as a matter of law only if the
appellant objected on that ground in the trial below." *See*

*Glenn v. Bartlett*, 98 F.3d 721, 724 n.2 (2d Cir. 1996) (citing N.Y. Crim. Proc. Law § 470.05(2)).

It is well-settled that the contemporaneous objection rule has been recognized as a firmly established and regularly followed independent state procedural ground in New York barring federal review of a federal claim. *See, e.g.*, *Garcia v. Lewis*, 188 F.3d 71, 76-78 (2d Cir. 1999) (holding that "the Appellate Division's explicit invocation of the procedural bar constitutes" an independent and adequate state law ground). The critical issue in this case is thus whether application of the contemporaneous objection rule was "adequate" under the *Lee* factors to preclude federal review. *See Cotto*, 331 F.3d at 240 (noting that "[a]fter *Lee*, . . . the relevant question . . . is whether application of the procedural [contemporaneous objection] rule is 'firmly established and regularly followed' in the specific circumstances presented in this case, an inquiry that includes an evaluation of the" *Lee* factors).

The *Lee* factors indicate that the application of the firmly established and regularly followed contemporaneous objection rule in this case was adequate to preclude federal review of petitioner's claim that Detective Pasquin's testimony violated his Confrontation Clause rights. First, because the procedural bar is the contemporaneous objection rule, the first

*Lee* guidepost "is less applicable . . . because the lack of a contemporaneous objection would not, almost by definition be mentioned by the trial court." *Cotto*, 331 F.3d at 242. Further, because the trial court had no opportunity to make a determination about the propriety of the testimony under the Confrontation Clause, it is impossible to know whether perfect compliance would have changed the trial court's decision under the first *Lee* factor. *See Donaldson v. Ercole*, No. 06-5781-pr, 2009 WL 82716, at *2 (2d Cir. Jan. 14, 2009).

Moreover, even if petitioner's counsel had objected to the admission of the testimony on the basis of the Confrontation Clause, the objection would not have altered the trial court's decision because the objection would have been meritless. Thus, even if trial counsel had made a Confrontation Clause objection, trial counsel would not have succeeded in preventing the admission of Detective Pasquin's testimony regarding Prosper's statements. The testimony was admitted to inform the jury of the evolution of the robbery investigation, not for the truth of the matter asserted. *See People v. Moreno*, 755 N.Y.S.3d 868, 869 (no error in trial court's admission of "detective's hearsay testimony concerning a codefendant . . . [because] the testimony was admitted to demonstrate how the police investigation evolved" and not for the truth of the matter asserted). Therefore, the testimony did not implicate Sixth Amendment

concerns.  *See Crawford v. Washington*, 541 U.S. 36, 59 n.9

(2004) (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985))

("The [Confrontation] Clause also does not bar the use of

testimonial statements for purposes other than establishing the

truth of the matter asserted.").  Accordingly, the first *Lee*

factor is neutral or weighs slightly in favor of respondent.

Under the second *Lee* factor, compliance with the

contemporaneous objection rule is well-established in the

specific circumstances presented, namely, a Confrontation Clause

objection to testimony at trial.  *See People v. Alvarado*, 3

A.D.3d 320, 769 N.Y.S.2d 881 (1st Dep't App. Div. 2004) ("[A]

Confrontation Clause argument requires a specific

contemporaneous objection.") (collecting cases)).  This second

factor therefore weighs in favor of respondent.

Finally, because petitioner's counsel never made any

Confrontation Clause objection to Detective Pasquin's testimony,

the third *Lee* factor – "whether petitioner had substantially

complied with the rule given the realities of trial," *Cotto*, 331

F.3d at 240 (citation omitted) – weighs in favor of respondent

as well.  Inherently, no "substantial compliance with a

contemporaneous objection rule" is possible when no

Confrontation Clause objection "was even implied in the trial

court."  *See Donaldson*, 2009 WL 82716, at *3.  Thus, weighing

all three *Lee* factors indicates that not only is the contemporaneous objection rule firmly established and regularly followed, but it is also "adequate" under the specific circumstances of this case to prelude federal review.

Additionally, there is nothing in the record to suggest that petitioner can establish cause and prejudice or a fundamental miscarriage of justice. *See Cotto*, 331 F.3d at 239 n.10. Accordingly, the state court's denial of this claim for failure to preserve precludes federal review of the claim. *See, e.g.*, *Garcia*, 188 F.3d at 78-79 ("[I]f a state appellate court refuses to review the merits of a criminal defendant's claim of constitutional error because of his failure to comply with . . . a 'contemporaneous objection' rule, a federal court generally may not consider the merits of the constitutional claim on habeas review.") (citation omitted).

Moreover, as noted, even if this court were to reach the merits, petitioner's claim would fail because the testimony was not admitted for the truth of the matter asserted and therefore did not implicate Sixth Amendment concerns. *See Crawford*, 541 U.S. at 59 n.9 ("The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.")

(citation omitted).  Petitioner was therefore not prejudiced in any way by application of this state procedural rule.

Thus, because petitioner's Confrontation Clause claim is barred by an independent and adequate procedural bar, and because regardless of that bar, the claim is meritless, petitioner's request for habeas relief on this ground is denied.

## II.  Sentencing-Related Claims

### A.  Evidence Considered by Sentencing Court

Petitioner contends that the pre-sentence report, provided by the state to the sentencing court, contained errors and that the sentencing court's consideration of the inaccurate information unfairly prejudiced him in violation of the Due Process Clause.  (Pet. at 4.)  In particular, petitioner contends that (i) the report should not have mentioned a murder that resulted from one of petitioner's prior robberies because he was acquitted of the murder charge; and (ii) the report should not have mentioned that prison officials found a shank (a rudimentary knife) on petitioner while he was incarcerated, given that the state filed no formal charges.  (Resp. Ex. H at 4-9.)  Respondent asserts that this claim lacks merit and is barred from federal review on an independent and adequate state procedural ground.  (Pet. at 17.)  The state court denied this due process claim on procedural grounds for failure to comply

with New York Criminal Procedure Law § 440.30(4)(c) and (d), as well as on the merits.  (*See* Resp. Ex. J at 3-5.)

### 1. Procedural Bar

Under Section 440.30(4), a court presented with a motion to vacate filed pursuant to New York Criminal Procedure Law Section 440.10,

> "*[u]pon considering the merits of the motion* . . . may deny it without conducting a hearing if . . . [a]n allegation of fact essential to support the motion is conclusively refuted by unquestionable documentary proof; or [a]n allegation of fact essential to support the motion (i) is contradicted by a court record or other official document, or is made solely by the defendant and is unsupported by any other affidavit or evidence, and (ii) under these and all the other circumstances attending the case, there is no reasonable possibility that such allegation is true."

N.Y. Crim. Pro. L. §§ 440.30(4)(c) and (d) (emphasis added).

A claim denied in state court under Section 440.30(4) should not be treated as an adequate state procedural ground to bar federal review.  In an unpublished summary order, the Second Circuit held that a state court's denial of a claim pursuant to § 440.30(4)(c) does not preclude federal review of the claim because the denial is on the merits and not on a state procedural ground.  *See Garcia v. Portuondo*, 104 Fed. Appx. 776, 779 (2d Cir. 2004) (vacating district court's review on the merits of a claim denied in state court pursuant to § 440.30(4)(c) and remanding for further proceedings).  The Second

Circuit held that the "plain language" of § 440.30(4) indicates that state courts resolve such motions on the merits when they deny them under this provision. *Id*. Thus, in the instant action, the state court's reliance on §§ 440.30(4)(c) and (d) does not preclude federal review of this claim. *See Williams v. Breslin*, 06-CV-2479 (SJF), 2008 WL 4179475, at *6 n.8 (E.D.N.Y. Sept. 9, 2008) (citing *Garcia*, 104 Fed. Appx. at 779) (noting that "application of N.Y.C.P.L. § 440.30(4) constitutes an adjudication on the merits").

### 2. Merits

"Misinformation or misunderstanding that is materially untrue regarding a prior criminal record, or material false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process." *United States v. Malcolm*, 432 F.2d 809, 816 (2d Cir. 1970) (citing *Townsend v. Burke*, 334 U.S. 736, 740-41 (1948)). "Not every defect in the sentencing process, however, is of constitutional dimension." *Malcolm*, 432 F.2d at 816 (noting that a technical misstatement of a defendant's criminal record does not rise to the level of a due process violation). Due process requires that a convicted defendant: "(1) not be sentenced based on materially false information, (2) not be sentenced based on a material misapprehension of fact, and (3)

be given notice and an opportunity to contest the facts upon which the sentencing authority relied in imposing the sentence." *Dewall v. Superintendent, Mohawk Corr. Fac.*, 05-CV-5583 (NGG)(RLM), 2008 WL 3887603, at *13 (E.D.N.Y. Aug. 20, 2008) (denying petitioner's due process sentencing claim) (internal citations and quotation marks omitted).

Petitioner's due process claim lacks merit. First, the pre-sentence report did not contain any inaccurate information. With respect to the petitioner's prior arrest for murder, the pre-sentence report stated:

> On June 14, 1989, in Bronx County, the defendant and a number of other individuals committed another gunpoint robbery during which the victim was shot and killed. The defendant was arrested for Murder in the Second Degree and subsequently pled guilty to Robbery in the Second Degree and was sentenced to two to six years . . . .

(Resp. Ex. H and attachments.) The report does not specify whether petitioner was, as he asserts, tried and acquitted on the murder charge or whether the state dropped the charge pursuant to a plea agreement on the robbery charge. It simply states that petitioner was arrested and charged with Murder in the Second Degree but pled to Robbery in the Second Degree, which petitioner does not dispute.

With respect to the weapon possession, the presentence report states:

> Furthermore during the course of the trial
> on this case the defendant was found by a
> corrections officer to be in possession of a
> knife like weapon while inside a
> correctional facility.

(Resp. Ex. H and attachments.)  The report does not indicate

whether defendant was formally charged for illegal possession of

a weapon.  Again, petitioner does not dispute that he was caught

with an illegal weapon, but contends that the report should not

have mentioned it.

Further, none of the foregoing information regarding

petitioner's criminal record is outside the scope of what a

sentencing court may review in preparation for sentencing.

*Cf. Hill v. Sciarrotta*, 140 F.3d 210, 215 (2d Cir. 1998) (noting

that subject to due process limitations, "the judge's discretion

in sentencing is largely unlimited either as to the kind of

information he may consider, or the source from which it may

come") (internal citations and quotation marks omitted).

Second, the sentencing court did not misapprehend a

material fact.  A review of the sentencing minutes indicates

that the sentencing court did not rely on the alleged wrongly

mentioned information in sentencing petitioner as a persistent

violent felony offender.  (*See generally* Resp. Ex. E.)  The

state prosecutor did mention the murder (*id.* at 3-4); however,

defense counsel clarified for the court that petitioner was

acquitted of the murder charge stemming from the robbery (*id*. at 5-6). Thus, the court was not under any misimpression or confusion as to the disposition of the murder charge. In announcing the sentence, including the decision to sentence petitioner as a persistent violent felony offender, the court explicitly stated that it based its decision on petitioner's two prior violent robbery convictions from 1989 and his prior federal firearm felony. (*Id*. at 9; Resp. Ex. H and attachments.) The court expressly disclaimed consideration of petitioner's prior violent misdemeanors (Resp. Ex. E at 9-10) and made no mention or findings as to the murder charge or the weapon possession in the correctional facility.

Finally, petitioner was given notice of the allegedly inaccurate information and an opportunity to correct it. At the outset of the sentencing proceeding, the court told petitioner that if he disagreed with anything contained in the pre-sentence report, he was entitled to a hearing on the accuracy of the report. (*Id*. at 2-3.) Petitioner indicated that he had reviewed the report prior to sentencing and admitted to the listed convictions. (*Id*. at 3.) As mentioned above, defense counsel informed the court of petitioner's murder acquittal and neither petitioner nor counsel contested inclusion of the weapon incident in the report. Petitioner was given notice and an

opportunity to be heard on the challenged inaccuracies, and did, in fact, inform the court of his murder acquittal.

Under these circumstances, there was no violation of due process as there was no inaccurate information before the court, and, in any event, the sentencing court did not rely upon the challenged information in determining the petitioner's sentence. *See Dewall*, 2008 WL 3887603, at *13-16 (holding that a sentencing court's reference to a prior *assault case* as a *rape case* in sentencing the petitioner as a persistent violent felony offender did not support a due process claim when the factual description of the crime contained in the pre-sentence report indicated that a rape accompanied the assault and conviction of either charge would have supported sentencing as a persistent violent felony offender); *Wheeler v. Phillips*, 05-CV-4399 (JFB), 2006 WL 2357973, at *13 (E.D.N.Y. Aug. 15, 2006) (denying a due process claim challenging a sentencing court's adjudication of petitioner as a persistent violent felony offender when petitioner received the pre-sentence report prior to sentencing, petitioner admitted commission of the predicate felony at sentencing, and petitioner made no challenge to the veracity of the pre-sentence report).

Accordingly, the state court's rejection of petitioner's claim on the merits was not an unreasonable

application of, or contrary to, clearly established federal law. Petitioner's request for habeas relief on this ground is denied.

### B.  Excessive or Overly Harsh Sentence

Petitioner contends that his due process rights were violated when the sentencing court sentenced him to consecutive sentences instead of concurrent sentences. (*See* Pet. at 4-5.) Respondent asserts that this claim should be denied as it is not cognizable under federal law. (*See* Resp. at 19-20.) The state court denied this claim for lack of merit, noting that the charges and convictions, each for a different victim, supported consecutive sentencing under New York law. (*See* Resp. Ex. J at 5-7 (citing N.Y. Penal Law § 70.25).)

To the extent that petitioner attacks his sentence as a violation of New York law, he fails to present a federal claim reviewable by this court. "Issues regarding sentencing under state statutes are not federal claims, and thus are not cognizable under federal habeas review." *Freeman v. Burge*, 05-CV-1585 (JFB), 2009 WL 1468464, at *15 (E.D.N.Y. May 22, 2009) (denying petitioner's challenge to consecutive sentencing) (internal citations omitted). Indeed, "it is purely a matter of state law how a prison term should be served, whether concurrent or consecutive." *Lopez v. Goord*, 05-CV-5855 (AKH), 2008 WL 3158447, at *4 (S.D.N.Y. Aug. 5, 2008) (denying petitioner's

consecutive sentencing claim as not cognizable under federal
law) (internal citations omitted); *accord Davis v. Herbert*, 02-
CV-4908 (JBW), 2003 WL 23185747, at *15 (E.D.N.Y. Oct. 24, 2003)
("Whether the sentence could be consecutive was a matter of
state law and raises no Constitutional issue."). Further, "no
constitutional issue is presented where a sentence falls within
the range prescribed by state statutory law." *Freeman*, 2009 WL
1468464, at *15 (citing *Chisholm v. Henderson*, 736 F. Supp. 444,
449 (E.D.N.Y. 1990) (internal quotation marks omitted)).

In the instant action, the only issue is whether
petitioner's consecutive sentences fall within the sentencing
range prescribed by state statutory law. Under New York law, a
court may sentence a defendant convicted of Robbery in the First
Degree (N.Y. Penal Law § 160.15(4)), a class B felony, to a
maximum term of imprisonment of 25 years. *See* N.Y. Pen. L. §
70.00(2)(b). Further, under New York law, the sentencing court
has the discretion to impose consecutive sentences for separate
and distinct acts. *See* N.Y. Penal Law § 70.25(2); *People v.
Salcedo*, 92 N.Y.2d 1019, 1021-22 (1998) (noting that "where the
crimes are committed through separate and distinct acts, even
though part of a single transaction, consecutive sentences are
possible"). Petitioner's convictions for the armed robbery of
three separate victims, though occurring during the course of
one afternoon, constitute three separate crimes. *See, e.g.,*

37

*Oyague v. Artuz*, 393 F.3d 99, 105 (2d Cir. 2004) ("Numerous Appellate Division decisions have . . . upheld consecutive sentences for robberies of separate victims 'within a single extended transaction.'") (internal citations omitted). As such, petitioner's three, twenty-five-year consecutive sentences fall within the statutory range provided by New York law.

Accordingly, the state court's rejection of petitioner's claim on the merits was not an unreasonable application of, or contrary to, clearly established federal law. Petitioner's request for habeas relief on this ground is denied.

## III. Ineffective Assistance of Counsel Claim

Petitioner points to several errors committed by his trial counsel in asserting a Sixth Amendment claim for ineffective assistance of counsel. (*See* Def. 440.10 App., Resp. Exs. L-1, L-2, N.) Respondent contends that none of these errors individually or in combination, rise to the level of ineffective assistance. (*See* Resp. 20-28.)

*Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the seminal Supreme Court case defining the contours of the right to effective assistance of counsel, qualifies as "clearly established" law for purposes of Section 2254(d)(1) under AEDPA. *See Williams*, 529 U.S. at 390-91. *Strickland* set forth a two-part test for ineffective assistance of counsel claims: first, a

petitioner must demonstrate deficient performance by counsel

(the "performance prong"), and second, the petitioner must show

that the deficiency prejudiced the defense (the "prejudice

prong"). *See Strickland*, 466 U.S. at 687-88. It is the

accused's "heavy burden" to demonstrate a constitutional

violation under *Strickland*. *United States v. Gaskin*, 364 F.3d

438, 468 (2d Cir. 2004); *see also United States v. Cronic*, 466

U.S. 648, 658 (1984).

Counsel is "ineffective" under the performance prong

when counsel's efforts fall "below an objective standard of

reasonableness." *Williams*, 529 U.S. at 390-91 (*quoting

Strickland*, 466 U.S. at 688). The Supreme Court has "declined

to articulate specific guidelines for appropriate attorney

conduct and instead ha[s] emphasized that the proper measure of

attorney performance remains simply reasonableness under

prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510,

521 (2003). In assessing an attorney's effectiveness, a court

must make "every effort . . . to eliminate the distorting

effects of hindsight . . . and to evaluate the conduct from

counsel's perspective at the time" while "indulg[ing] a strong

presumption that counsel's conduct falls within the wide range

of reasonable professional assistance."[10]  *Strickland*, 466 U.S.
at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

A defendant may satisfy the prejudice prong under
*Strickland* by proving that "'there is a reasonable probability
that, but for counsel's unprofessional errors, the result of the
proceeding would have been different.  A reasonable probability
is a probability sufficient to undermine confidence in the
outcome.'"  *Williams*, 529 U.S. at 391 (*quoting Strickland*, 466
U.S. at 694.)

Yet, an ineffective assistance of counsel claim
reviewed under the deferential Section 2254(d)(1) standard
raises the question "not [of] whether a federal court believes
the state court's determination" under *Strickland* "was
incorrect[,] but whether [it] was unreasonable--a substantially
higher threshold."  *Knowles v. Mirzayance*, --- U.S. ----, 129 S.
Ct. 1411, 1420 (2009) (citation omitted).  Moreover, because the
*Strickland* standard "is a general standard, a state court has
even more latitude [under Section 2254(d)(1)] to reasonably
determine that a defendant has not satisfied that standard."
*Id.*  Given this wide latitude, the Supreme Court has

_____

[10]    Petitioner incorrectly argues that this "strong presumption" does not
attach in the context of claims regarding effective and sufficient plea
advice.  (*See* Pet. Reply Mem. at 4.)  To the contrary, this presumption does
apply in cases involving plea advice, and the Second Circuit has so applied
it.  *See Carrion v. Smith*, 549 F.3d 583, 590 (2d Cir. 2008) (discussing the
"*Strickland* presumption of effective performance" in the context of a habeas
claim based upon ineffective plea advice).

characterized the standard of judicial review applicable to ineffective assistance of counsel claims under § 2254(d)(1) as "doubly deferential." *Id.*

**A. Failure to Provide Adequate Plea Advice**

There is no doubt that a defendant's Sixth Amendment right to counsel attaches at all critical stages of criminal proceedings, including plea negotiations. *See, e.g.*, *Boria v. Keane*, 99 F.3d 492, 496-97 (2d Cir. 1996). Here, while conceding that his trial counsel conveyed the terms of the plea offer to him, petitioner contends that counsel violated this Sixth Amendment right by failing to advise him of the maximum post-trial sentence exposure. (*See* Resp. Ex. L-1 at 4-13, 2-21; *see also* Doc. No. 32, Pet. Supp. Mem.; Doc. No. 38, Pet. Reply Mem.) Petitioner asserts that had counsel provided this advice, he would have accepted the plea offer. (*See* Resp. Ex. L-1 at 4-6.)

Respondent contends that petitioner failed to carry his burden of proving both that defense counsel provided ineffective assistance during state court plea negotiations and that petitioner was prejudiced by his counsel's alleged ineffective assistance. (*See* Resp. at 21-23; Doc. No. 37, Resp. Post-Hearing Mem.)

The state court rejected petitioner's ineffective assistance claim on the merits without an evidentiary hearing. (*See* Resp. Ex. O at 8-11.)

### 1. *Performance Inquiry*

Thus, the court must determine here whether the state court's determination that petitioner failed to meet his burden on the performance prong is an "'an unreasonable application of clearly established Federal law' in light of all the facts and circumstances" including those facts "discovered during [this court's] post-conviction hearing" pursuant to 28 U.S.C. § 2254(e)(1)"). *See Wilson*, 570 F.3d at 500. Here, that state court's determination noted the undisputed fact that counsel advised petitioner of the terms of the plea offer in this case, but without making any explicit factual finding as to the quantity or quality of any other plea advice provided by counsel. However, the state court implicitly rejected petitioner's assertion that his counsel "failed to advise him of the benefits of the plea offered by the People of $1^1/_2$ to 3 years imprisonment, and . . . the possible consequences of declining the plea and taking the matter to trial." (*See* Resp. Ex. O at 9-10.) Further, the state court essentially found that the circumstances of this case did not require counsel to expressly

recommend acceptance of the plea offer or to warn petitioner of the maximum sentencing range.

Under the performance prong of the *Strickland* standard, it is well-settled that counsel "must give the client the benefit of counsel's professional advice on [the] crucial decision of whether to plead guilty." *Purdy v. United States*, 208 F.3d 41, 44 (2d Cir. 2000) (internal quotation marks omitted) (quoting *Boria*, 99 F.3d at 497). At a minimum, this requires that "counsel . . . communicate to the defendant the terms of the plea offer, and should *usually* inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." *Id.* at 45 (internal citations omitted) (emphasis added).

Yet, while some modicum of professional consultation in the plea process is required, there is no *per se* requirement that in order to provide constitutionally effective assistance an attorney must expressly advise a client in every case as to whether the client should accept a plea. *See Purdy*, 208 F.3d at 48 (noting that no *per se* rule exists regarding plea recommendations and that "reasonable professional conduct does not under all circumstances require a lawyer to give an explicit opinion as to whether a client should take a plea offer"); *see*

*also Wiggins*, 539 U.S. at 521 (noting Supreme Court's refusal "to articulate specific guidelines for appropriate attorney conduct" and instead emphasizing guiding principle of "reasonableness" when assessing effectiveness of counsel's performance).  Thus, "[c]ounsel's conclusion as to how best to advise a client in order to avoid, on the one hand, failing to give advice and, on the other, coercing a plea enjoys a wide range of reasonableness . . . ."  *Purdy*, 208 F.3d at 45-46 (counsel's "decision to forgo specifically and explicitly telling [the defendant] whether he should accept the government's plea offer was . . . within the range of professional reasonableness" particularly in light of the defendant's "steadfast protestations of innocence" and the need for counsel to avoid "improper coercion").

However, the Second Circuit has noted in *dicta* the possibility that some circumstances could require that counsel give a client advice as to whether to accept a plea offer in order to provide constitutionally effective assistance of counsel.  Specifically, the Second Circuit has left open the question of whether effective assistance of counsel might demand an attorney provide express plea advice in the narrow circumstances where proceeding to trial would be "unreasonable" and against the client's "best interests," for example, where there is both a high likelihood of conviction and a significant

disparity between the plea offer and the sentencing exposure
after trial. *See Purdy*, 208 F.3d at 47 (distinguishing *Boria* as
a case where defendant's "best interests . . . necessarily
demand[ed] a guilty plea" because "there was no reasonable
chance of acquittal" and finding no requirement for express plea
advice where client's decision to go to trial was, if "unwise, .
. . at least reasonable") (internal quotations and citations
omitted); *see also Carrion*, 549 F.3d at 590 ("[T]here may
perhaps be circumstances where the disparity between the
sentence offered under a plea agreement and the sentencing
exposure in the absence of such agreement (factoring in both the
probable sentence and the likelihood of conviction) might
require counsel to give advice about the benefits and risks of
accepting or not accepting a plea offer beyond merely stating
the sentencing exposure."). Ultimately, however, a decision of
whether to accept a plea is the client's decision. *See Boria*,
99 F.3d at 497.

Here, as noted by the state court, it is undisputed
that counsel advised petitioner of the substance of the plea
offer (*See* Resp. Ex. O at 7; *see also* Resp. Ex. L-1 at 4-5), and
therefore met the minimum requirement for effective assistance
of counsel in the plea context by providing what is considered
"the most basic advice" pre-trial. *See Cullen v. United States*,
194 F.3d 401, 404 (2d Cir. 1999) ("Even if there might be

circumstances where defense counsel need not render advice as to acceptance of a plea bargain, there can be no doubt that counsel must always communicate to the defendant the terms of any plea bargain offered by the prosecution."); *see also Purdy*, 208 F.3d at 45 ("counsel must communicate to the defendant the terms of the plea offer").

Further, the additional facts revealed through the evidentiary hearing in this court fail to rebut the state court's implicit determination that petitioner's trial counsel provided additional, sufficient and effective advice regarding petitioner's maximum sentencing exposure. Petitioner himself admitted on the stand in no uncertain terms – by going so far as to correct respondent's counsel – that he had at least one, and perhaps two discussions with Millet regarding the possible sentence he faced in this case. (H. 36.) This admission refutes petitioner's repeated, self-serving, after-the-fact assertions that he was never informed of the maximum sentence exposure he faced, and the court declines to credit such assertions. (*See* H. 14, 16, 17.) Rather, because petitioner's acknowledgement that he did discuss the sentencing exposure in this case was against his interests, it is imbued with greater indicia of reliability, and the court credits petitioner's unequivocal testimony on this point over his contradictory testimony that he never received such advice. Petitioner's

testimony alone may suffice to defeat petitioner's ineffective assistance of counsel claim. *See, e.g.*, *Purdy*, 208 F.3d at 47-48 (holding that even though counsel "never advised [his client] in so many words" about whether or not to plead guilty, he provided effective counsel because he advised his client on the factors necessary to allow defendant to make an informed decision, such as the strength of the government's case and other benefits of pleading guilty).

Petitioner's acknowledgement that he discussed the maximum sentence exposure with Millet is further buttressed by both Millet's roughly contemporaneous notes and Millet's credible testimony regarding his usual and customary practices as a criminal defense attorney. First, Millet's case records indicate that Millet consulted with petitioner multiple times, both in person and over the telephone, for a total of two and a quarter hours prior to petitioner's rejection of the plea offer. (H2. 43, RX G, H.)

Second, although Millet testified that he had no independent recollection about the substance of his conversations with petitioner given that he has represented thousands of clients over the course of a nearly forty year career as a criminal defense attorney and represented petitioner over nine years ago (H. 93, 95, 113-14; H2. 45), the court may

rely upon Millet's testimony regarding his usual practice. *See*
*Carrion*, 549 F.3d at 590 (lower court permissibly relied on
attorney's testimony concerning his usual practice given that
twelve years passed since events and noting that "[t]ime
inevitably fogs the memory of busy attorneys" but that such
"inevitability does not reverse the *Strickland* presumption of
effective performance") (citation omitted). Here, Millet
credibly testified that it is his usual practice to advise
clients about their maximum sentencing exposure, chances of
success at trial, and his view as to the quality of the plea
offer. (H. 98.) Moreover, in cases such as petitioner's, where
a client faces the potential for consecutive sentences, Millet
credibly testified that he advises clients of their sentencing
exposure in at least 90% of cases and explained that he declines
to do so when a client has already expressed a strong preference
to plead guilty. (H2. 4-7, 37-38.) Additionally, Millet
testified that as his usual practice, he provides a
recommendation as to whether to accept a plea in roughly 75% of
cases where clients face the potential for consecutive
sentences. (H2. 4-7.)

The reliability of Millet's testimony and the
appropriateness of relying on his reported usual practices is
enhanced by Millet's credible and specific recollection of the
circumstances of this case. Namely, Millet credibly testified

that at the time, he recalled viewing the plea offer in petitioner's case as "in the immortal words of the Godfather . . . an offer you can't refuse" (H2. 3), and he further credibly testified that based upon his customary practice he believes it to be "almost impossible" that he would not have conveyed his views on the quality of the plea to petitioner (H2. 3-4, 7). Based on Millet's strong expressions of his favorable view regarding the plea offer in petitioner's particular case, it appears highly unlikely that Millet would have deviated from the usual practice he employed in 90% of cases involving the potential for consecutive sentencing. Indeed, Millet credibly testified about why he had viewed the $1^1/_2$ to 3 year offer so favorably in this case including that petitioner had already served "a good part of the . . . minimum" (H2. 3), and stated that he cannot think of "any" reason why he would not have discussed his views regarding the quality of the offer during one of his many conversations with petitioner prior to petitioner's rejection of the plea (H2. 36-37). In light of the strong *Strickland* presumption of effective performance, Millet's credible testimony reinforces petitioner's own sworn admission that Millet did discuss the sentencing exposure with petitioner. (H. 36.)

Further, petitioner's written correspondence with his first attorney, Mure, shows that petitioner was also aware that

Mure had suggested petitioner could be facing "life," regardless of whether petitioner chose to believe him. (RX A, H. 54-57, 80.) All of this evidence, including petitioner's own admission, supports the state court's determination that petitioner received adequate counsel from his attorneys regarding the plea offer during multiple conferences.

Moreover, to the extent that the state court decision suggests that counsel's performance would not have been deficient even if counsel failed to provide an express recommendation about whether to accept a plea offer or the maximum sentencing exposure, this court agrees. (*See* Resp. Ex. O at 10) (rejecting defendant's argument that "his counsel should have made a greater effort to talk him into accepting the offer that had been conveyed"). First, as noted *supra*, there is no *per se* rule requiring advice on these points in every case. *See Purdy*, 208 F.3d at 48. Second, this case falls outside the narrow class of cases in which the Second Circuit has suggested that circumstances could require that counsel provide such specific advice. *Cf. Boria*, 99 F.3d at 497 n.4 (granting habeas relief where counsel failed to advise client of desirability of a plea even though counsel believed that rejection of the plea would be "suicidal" because "getting an acquittal in a drug case [such as petitioner's] in upstate New York was almost impossible"). Thus, the facts here are unlike *Boria*, 99 F.3d at

498, where the defendant had no "reasonable chance of acquittal," and instead are similar to the facts in *Purdy*, 208 F.3d at 47, where the petitioner's decision to go to trial, if also perhaps "unwise" was "at least reasonable" given the perceived weakness of the case against him.  Here, the benefit of accepting the plea offer was not clearly in petitioner's best interests because the state's case against petitioner was not, in petitioner's view, without weakness.  *See Purdy*, 208 F.3d at 47 (noting that *Boria*'s holding applied to a case where defendant's "best interests . . . necessarily demand[ed] a guilty plea").  As the state court noted, petitioner "had not confessed, there was little or no forensic evidence connecting him to the crime and the eyewitness testimony was of questionable value as the perpetrators wore masks."  (*See* Resp. Ex. O at 11.)

Accordingly, the state court's finding that petitioner failed to meet his burden on the *Strickland* performance prong is not an unreasonable application of, or contrary to, clearly established federal law.

### 1.   *Prejudice Inquiry*

While the finding that petitioner did not meet his burden on *Strickland*'s performance prong is alone sufficient to require denial of this claim, the court also considers, and

51

rejects, petitioner's argument under the prejudice prong of *Strickland*. *See Strickland*, 466 U.S. at 697 ("there is no reason for a court to . . . address both [the prejudice and performance] components of the inquiry if the defendant makes an insufficient showing on one").

To establish prejudice, petitioner must demonstrate that but for trial counsel's failure to discuss the benefits of the plea offer, petitioner would have pled guilty. *See Purdy*, 208 F.3d at 49 ("Under this second part of *Strickland's* test, [petitioner] must demonstrate a reasonable probability that but for [trial counsel's] deficiencies, [petitioner] would have pled guilty.") (citation omitted). Moreover, a petitioner must present some objective evidence aside from his own self-serving post-conviction statements in order to show prejudice. *See Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003); *see also Cullen*, 194 F.3d at 407-08. However, self-serving statements should not be rejected solely because they are self-serving, and instead, a credibility determination as to the petitioner's statements "should be based upon all relevant circumstances." *Cullen*, 194 F.3d at 407-08.

Assessing all the relevant circumstances and evidence here, petitioner fails to demonstrate a reasonable probability that but for counsel's allegedly deficient performance,

petitioner would have pleaded guilty.  First, petitioner urges the court to weigh the objective evidence of the disparity between the sentence imposed and the plea offer in conjunction with his own assertions to find that the prejudice prong has been met.  (Pet. Supp. Mem. at 11-12.)    This argument is unpersuasive on the facts of this case.  Certainly, in some instances an excessive disparity between plea offer and ultimate sentence (a "sentencing disparity") might support a finding of prejudice under *Strickland*.  *See Pham*, 317 F.3d at 182 ("a significant sentencing disparity in combination with defendant's statement of his intention [to plead guilty] is sufficient to support a prejudice finding").  However, in this case, the sentencing disparity is outweighed by another consideration: the negligible disparity between the plea offer of $1^1/_2$ to 3 years imprisonment offered and the 1 year plea bargain demanded by petitioner.  (H. 77, 90; H2. 62.)  If, as petitioner testified at the hearing, he was indeed willing and ready to plead guilty in this case (H2. 62), it is unfathomable why the minor disparity between petitioner's professed desired plea bargain of 1 year, and the offered plea bargain of $1^1/_2$ to 3 years would have dissuaded petitioner from doing so.  The only rational explanation for petitioner's decision is not that petitioner did not understand his maximum sentencing exposure, but rather, that

petitioner believed he could go to trial and win, and was therefore unwilling to plead guilty.

Indeed, as the state court noted, "at the time the [plea] offer was conveyed, [petitioner] appeared to have a reasonable chance of prevailing at trial" and he "took a calculated gamble that he could prevail at trial, but calculated wrong." (*See* Resp. Ex. O at 10.) In correspondence to Mure and the trial court, petitioner repeatedly discussed his view that the evidence against him was "flimsy." (H. 59, RX C at 5.) It seems that this view was shared even by the trial court. As the state court pointed out, the trial court's plea offer provided for a minimal term of imprisonment ($1^1/_2$ to 3 years) precisely "because the prospects for conviction at trial appeared less than assured." (*Id.*) Additionally, this indictment was not petitioner's first encounter with the criminal justice system. (*See* Resp. Ex. E at 3-5.) At the time of his arrest, petitioner had a lengthy criminal history, including prior violent robberies and other violent crimes. (*Id.*) Given the nature of the case against petitioner and petitioner's familiarity with the criminal justice system (including, as petitioner has indicated, an acquittal on a prior murder charge), it appears likely that petitioner made a calculated decision to reject the plea with the goal of avoiding imprisonment altogether.

Moreover, although petitioner testified at the hearing before this court that he would have "immediately" accepted the plea offer had he understood his sentencing exposure, his contemporaneous statements suggest otherwise and undermine the credibility of his hearing testimony. (H. 25-26; H2. 62.) Prior to rejecting the plea offer, petitioner repeatedly emphasized that "I've maintained my innocence and the charges are bogus" and "I have an absolute confidence in my innocence" (RX A; H. 54-57). These repeated professions of innocence are incompatible with petitioner's post-conviction testimony that he would have pleaded guilty. *See, e.g.*, *United States v. Feyrer*, 333 F.3d 110, 120 (2d Cir. 2003) (finding that defendant's repeated assertions of innocence are "obviously incompatible with the suggestion that he would have readily pled guilty" and that under such circumstances defendant "failed to demonstrate the required reasonable probability that, but for [counsel's] deficient performance as counsel, he would have pled guilty").

The record before the court belies petitioner's post-conviction, self-serving statements. Moreover, the state court's determination that petitioner failed to establish prejudice was not an unreasonable application of, or contrary to, clearly established federal law.

Accordingly, the state court's rejection on the merits of petitioner's ineffective assistance claim based upon trial counsel's allegedly deficient advice regarding the plea offer was not an unreasonable application of, or contrary to, clearly established federal law. Petitioner's request for habeas relief on this ground is denied.

## B.    Trial Errors

Additionally, the Petition can be construed as raising ineffective assistance of counsel claims premised on a variety of alleged trial errors. Petitioner contends that counsel failed to preserve his Confrontation Clause claim, failed to impeach Detective Pasquin with police reports, and failed to file various motions. Respondent contends that all of these claims lack merit.

### 1.    Failure to Preserve Confrontation Clause Claim

Petitioner asserts that trial counsel failed to preserve his Confrontation Clause claim by lodging an objection to Detective Pasquin's testimony regarding the accomplice on this ground, and that this failure amounts to ineffective assistance. (*See* Resp. Ex. L-1 at 20-29.) The state court rejected this claim on the merits. (*See* Resp. Ex. O at 8.)

Trial counsel objected to Detective Pasquin's testimony regarding the existence of an accomplice to the crime

on due process grounds. (*See* Tr. 73-75.)  It is unnecessary to determine whether counsel's failure to lodge a Confrontation Clause objection to the testimony amounts to deficient performance as it was not prejudicial.  The challenged testimony was presented to provide the jury with the evolution of the robbery investigation.  This use of out of court statements, such as those of petitioner's accomplice, does not implicate Confrontation Clause concerns as they were not presented for the truth of the matter asserted.  *See Crawford*, 541 U.S. at 59 n.9 (citing *Street*, 471 U.S. at 414)  ("The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.").  Thus, petitioner cannot demonstrate that but for his attorney's failure to object on Confrontation Clause grounds the court would have excluded the testimony.

Accordingly, the state court's rejection of petitioner's claim on the merits was not an unreasonable application of, or contrary to, clearly established federal law. Petitioner's request for habeas relief on this ground is denied.

### 2.    Failure to Impeach Detective Pasquin

Petitioner further contends that he was denied the effective assistance of counsel by his counsel's failure to impeach Detective Pasquin with police investigation reports.

(*See* Pet. at 4; Resp. Ex. L-1 at 29-33.)  Respondent asserts
that the court should reject this contention as the decision of
whether to impeach a witness is an issue of trial strategy
which, under *Strickland*, cannot support a claim of ineffective
assistance.  (*See* Resp. at 24.)  The state court rejected this
claim on the merits.  (*See* Resp. Ex. O at 8.)

      "Decisions about whether to engage in cross-
examination, and if so, to what extent and in what manner, are
. . . strategic in nature and generally will not support an
ineffective assistance claim."  *Dunham v. Travis*, 313 F.3d 724,
732 (2d Cir. 2002) (quoting *United States v. Nersian*, 824 F.2d
1294, 1321 (2d Cir. 1987)) (reversing grant of petition and
denying ineffective assistance claim); *Nersian*, 824 F.2d at 1321
(holding that petitioner failed to establish deficient
performance as trial counsel's decision to refrain from cross-
examining a witness was strategic and reasonable).  In the
instant action, trial counsel conducted an in depth cross-
examination of Detective Pasquin.  (*See* Resp. Ex. C at 93-101.)
Further, trial counsel questioned Detective Pasquin about
several investigation reports.  (*See id*.)  In particular, he
questioned Detective Pasquin about statements made by the
victims about their delayed reporting of the crime, notes
containing the victims' descriptions of the alleged
perpetrators, the completeness of the information the victims

provided the police, records of investigations into other
suspects, and the line-up at which petitioner was identified as
one of the perpetrators. (*See* Tr. 94-107.) Counsel's decision
not to impeach Detective Pasquin using the advocated reports was
strategic and cannot support a claim of ineffective assistance.
*See United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992)
(holding that trial counsel's decision not to impeach a witness
was tactical and cannot form the basis of an ineffective
assistance claim).

Accordingly, the state court's rejection of
petitioner's claim on the merits was not an unreasonable
application of, or contrary to, clearly established federal law.
Petitioner's request for habeas relief on this ground is denied.

### 3.    Failure to File Motions

Finally, petitioner raises an ineffective assistance
claim for trial counsel's failure to file unspecified pre-trial
motions. (*See* Pet. at 4; Resp. Ex. L-1 at 2, 29-33.) The
Petition and its attachments can be construed as raising a claim
premised on trial counsel's failure to move for a suppression
hearing with respect to anticipated identification testimony
from Detective Pasquin. (*See* Resp. Ex. L-1 at 29-33.)
Respondent contends that there was no need for a motion as the
state consented to a suppression hearing, which the parties

conducted on March 6, 2000. (Resp. at 23-24; Resp. Ex. A-2.)
The state court rejected this claim on the merits. (*See* Resp.
Ex. O at 13.)

Plaintiff's claim is undermined by the factual record.
As a preliminary matter, respondent correctly noted that there
was no need to move for a suppression hearing because the state
consented to a *Wade* hearing, which was held on March 6, 2000.
(Resp. at 23-24; Resp. Ex. A-2.) At the hearing, the parties
questioned Detective Pasquin and petitioner's former counsel,
Joseph Mure, Esq., about the victims' identification of
petitioner as one of the perpetrators. (*See* Resp. Ex. A-2.) In
particular, petitioner's trial counsel focused on victim William
Bonilla's identification of petitioner during the line-up as he
was the only victim able to identify petitioner. (*Id*.) At the
conclusion of the hearing, counsel orally moved to suppress
Bonilla's identification of petitioner on the grounds that the
photo array was suggestive, the line-up was suggestive, and
Bonilla allegedly commented that he was unable to see
petitioner's face on the night of the robbery. (*Id*. at 50-52.)
The court denied the motion to suppress, holding that neither
the photo array nor the line-up were suggestive and that Mr.
Bonilla did not state that he was unable to see petitioner's
face. (*Id*. at 54-56.) Thus, trial counsel's performance was
not deficient, as the government consented to the *Wade* hearing

(thereby negating the need for petitioner to move for such a hearing) and, upon conclusion of the *Wade* hearing, trial counsel moved orally for suppression of the identification testimony. Moreover, petitioner does not identify or suggest any other motion which defense counsel should have made, or any motion which, not having been made, prejudiced petitioner. *See generally Strickland*, 466 U.S. at 687-88 (detailing performance and prejudice prongs of ineffective assistance of counsel claims).

Accordingly, the state court's rejection of petitioner's claim on the merits was not an unreasonable application of, or contrary to, clearly established federal law. Petitioner's request for habeas relief on this ground is denied.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Petition is denied in its entirety. The Clerk of the Court is respectfully requested to dismiss the petition and close this case. Respondent shall serve a copy of this Memorandum and Order upon petitioner and file a declaration of service by July 28, 2010.

**SO ORDERED.**
Dated:     Brooklyn, New York
           July 26, 2010

_____/s/_____
**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York